IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiffs,<br><br>vs.<br><br>CHRISTIAN GONZALEZ-GARDEA, and PEDRO ADOLFO ROBLES,<br><br>Defendants. | **8:20CR114**<br><br>**FINDINGS AND RECOMMENDATION** |

This matter is before the Court on the motions to suppress evidence filed by Defendants Christian Gonzales-Gardea ("Gardea") and Pedro Adolfo Robles ("Robles"). (Filing Nos. 35 and 38.) A joint evidentiary hearing was held on the motions on September 25, 2020. A transcript has been filed and additional briefs have been received from the parties. Accordingly, these matters are now ripe for disposition. For the reasons explained below, the undersigned will recommend that Robles' motion be denied in its entirety and Gardea's motion be granted, in part, and denied in part.

## FACTS

At approximately 12:00 p.m. on January 29, 2020, Seward County Sergeant Kevin Beattie ("Sgt. Beattie") was patrolling eastbound traffic on I-80.[1] (TR. 85.) Sgt. Beattie testified that he was on I-80 looking for a different vehicle when he observed a tow truck with a white Ford F150 ("F150") in close proximity. (TR. 85.) The tow truck was hauling a Cadillac Escalade ("Escalade"). (TR. 8; TR. 15.) Sgt. Beattie testified that when he pulled out into traffic to catch up to the tow truck, he observed that the F150 was close enough to the tow truck to raise his suspicion that they were together.[2] (TR. 85.) Sgt. Beattie stated that when he passed the F150 to

---

[1] Sgt. Beattie has been employed with the Seward County Sheriff's Office since January of 2019. Prior to that, he was a law enforcement officer with the New York State Police for twenty-eight years. (TR. 84.) Sgt Beattie is assigned to the Seward-York Federal Interdiction Task Force. (TR. 85.)

[2] Sgt. Beattie testified that he found it suspicious that the license plate on the F150 was a Nebraska metro plate, as opposed to a county plate. (TR. 85-86.)

catch up to the tow truck, he observed that the F150 was following too closely behind a Walmart semi-tractor trailer. (TR. 86.) Sgt. Beattie testified that as he went by the F150, he got a look at the space between the F150 and the semi. (TR. 87.) Sgt. Beattie stated there was approximately one second between the vehicles. (TR. 87.) Sgt. Beattie testified that two seconds is considered a safe following distance.[3] (TR. 86.) Sgt. Beattie testified that he did make a recording of the traffic violation, but he could not find it and that there is a good chance it has been purged from the system. (TR. 88.)

Sgt. Beattie notified Seward County Deputy Ryon Blath ("Deputy Blath") that he felt the F150 was in violation of the Nebraska rules of the road and asked Deputy Blath to initiate a traffic stop on the F150 for following too closely.[4] (TR. 86.) Sgt Beattie testified he did not initiate the traffic stop because he was trying to catch up to the tow truck. (TR. 87.) Deputy Blath conducted a traffic stop on the F150. Rex Kmiecik ("Kmiecik") was identified as the driver of the F150. (Ex. 4; TR. 96.) Gardea and Stephanie Davis ("Davis") were identified as passengers. (Ex. 4.) Deputy Blath asked for everyone's ID. Kmiecik said he did not have a license. (Ex. 4.) Gardea told Deputy Blath that he did not have an ID. (Ex. 4.) Davis produced her driver's license. (Ex. 4.) Davis told Deputy Blath that their vehicle was on a tow truck in front of them and that they did not know the driver of the F-150. (Ex. 4.) As Deputy Blath was talking to Davis, Kmiecik rolled up his window. (Ex. 4.) Deputy Blath asked him to roll it back down, which he did, but Kmiecik then made a call on his cell phone and appeared to be talking to someone. (Ex. 4.) Deputy Blath got Gardea's name and date of birth and took Davis' license back to his patrol car. Deputy Blath told Kmiecik he was going to issue him a warning ticket and asked Kmiecik to come back to his cruiser. (Ex. 4.) Kmiecik agreed. (Ex. 4.)

Approximately four minutes into the traffic stop, Kmiecik was in Deputy Blath's cruiser. (Ex. 4.) Deputy Blath began the process of conducting a records check on Kmiecik. (Ex. 4.) Deputy Blath had some difficulty spelling Kmiecik's name. (Ex. 4.) Kmiecik was able to produce

---

[3] Sgt. Beattie testified that he believes the Nebraska road manual refers to a two second safe following distance.

[4] Due to a miscommunication, Deputy Blath did not testify at the evidentiary hearing. Counsel agreed, however, that Deputy Blath's testimony was unnecessary because the videos of the traffic stop are in evidence. (TR. 103-05.)

a state identification approximately fourteen minutes into the stop. (Ex. 4.) The records check raised a question if Kmiecik had a warrant out for a protection order violation. (Ex. 4.) Deputy Blath clarified that there was just a protection order against Kmiecik. (Ex. 4.) The F150 was not registered to Kmiecik, so Deputy Blath also had to verify the vehicle's registration. (Ex. 4.) As Deputy Blath ran the records check on Kmiecik, Deputy Blath spoke to him about his travel itinerary. (Ex. 4.) Kmiecik indicated he was following a tow truck traveling ahead of him. (Ex. 4.) Kmiecik explained he was helping the occupants of the F150 because their vehicle had broken down and he was friends with the passenger in the tow truck. (Ex. 4.) From the records check, Deputy Blath discovered Kmiecik's license was suspended. (Ex. 4.) Deputy Blath decided to issue a warning ticket for both violations. (Ex. 4.) The warning ticket for following too closely and operating during suspension was issued approximately thirty minutes into the stop. (Ex. 4.)

When Deputy Blath was in his cruiser with Kmiecik running the records check, Sgt. Beattie arrived at the location of the traffic stop. (TR. 90-91.) Deputy Blath explained to Sgt. Beattie that Kmiecik had a suspended license. (Ex. 4; TR. 90-91.) Deputy Blath and Sgt. Beattie decided to determine if Gardea could drive the F150 because Kmiecik had a suspended license. (Ex. 4; TR. 90-91.) Deputy Blath already had Davis' driver's license so when he was finishing up with Kmiecik, he ran a records check to determine if her license was valid, which it was. (Ex. 4.) Sgt. Beattie testified that the traffic stop was delayed because they needed to find a licensed driver for the F150. (TR. 91.)

Sgt. Beattie went to the F150 and made contact with Gardea and Davis. (Ex. 2; TR. 91-92.) Gardea was able to produce a Texas driver's license.[5] (Ex. 2; TR. 95.) Sgt. Beattie had Gardea accompany him to his patrol car. (Ex. 2; TR. 91.) Sgt. Beattie then began to conduct a records check on Gardea to determine if his license was valid.[6] (Ex. 2; TR. 91.) Initially, the records check was not coming back with the name and date of birth Sgt. Beattie gave dispatch, so Sgt. Beattie provided Gardea's license number to complete the check. (Ex. 2.) As this was

---

[5] Gardea initially told Deputy Blath he did not have a license and provided Deputy Blath with his name and date of birth. Davis later found Gardea's license in her purse and later explained to Deputy Blath she thought it was in the Escalade. (Ex. 4.)

[6] Sgt Beattie testified that it took approximately seven or eight minutes to confirm Gardea's license was valid. (TR. 97.)

occurring, Sgt. Beattie and Gardea discussed Gardea's travel and the purpose of his trip. (Ex. 2; TR. 101-02.) Sgt. Beattie testified these are typical questions asked during a traffic stop. (TR. 102.) Sgt. Beattie testified that there were things that came out during his conversation with Gardea that made him suspicious. (TR. 95.)

Sgt. Beattie testified that at some point not long after he arrived on the scene, Gardea indicated their vehicle was on a tow truck ahead of them. (TR. 91-92.) Gardea stated he did not know Kmiecik and that Kmiecik was with the tow truck company. (Ex. 2.) Sgt. Beattie told Gardea to stay in the patrol car and he got out to talk Kmiecik. (Ex. 2.) Sgt. Beattie asked Kmiecik questions about his travel itinerary to compare with what Gardea had told him. (Ex. 2; Ex. 4; TR. 102.) From his conversation with Kmiecik, Sgt. Beattie learned that the information provided by Gardea and Kmiecik did not match. (Ex. 2.)

Sgt. Beattie returned to his patrol car and started to ask Gardea a question when he received a call from someone on his cell phone. (Ex. 2.) Gardea was still sitting in the vehicle and could hear Sgt. Beatie's conversation. Sgt. Beatie told the person on the phone that he had more than enough to detain the occupants to further the investigation. (Ex. 2.) After getting off of the phone, Sgt. Beattie asked Gardea some questions and then told Gardea that his story did not match the information provided by Kmiecik. (Ex. 2.) Sgt. Beattie asked Gardea whether there were drugs in the vehicle or if he was transporting anything illegal. (Ex. 2; TR. 99-100.) Gardea said there were no drugs and that he had nothing to tell Sgt. Beattie. (Ex. 2; TR. 101.) Sgt. Beattie testified Gardea did not make any incriminating statements in response to these questions. (TR. 103.) Sgt. Beattie did not provide Gardea *Miranda* warnings prior to asking these questions. (Ex. 2; TR. 100.) Sgt. Beattie then told Gardea to stay in the vehicle. (Ex. 2.) Sgt. Beattie explained to him that they were going to take everyone until they searched the truck and after that they would decide what to do because they were suspicious something was going on. (Ex. 2.)

Sgt. Beattie got out of the patrol car to speak to Davis, who Sgt. Beattie referred to as Gardea's "wife." (Ex. 2, 4.) When Sgt. Beattie returned to his patrol vehicle, he told Gardea that he spoke to Davis and that their stories did not match. (Ex. 2.) He also told Gardea that neither his nor Davis' stories matched what Kmiecik had told him. (Ex. 2.) Sgt. Beattie told Gardea that he told Davis he thought drug trafficking going on and that she started to cry and said she did not

4

want to be separated from her kids. (Ex. 2.)  Sgt. Beattie asked Gardea why Davis would react like that when he mentioned drug trafficking.  (Ex. 2.)  Gardea indicated it was because she was scared. (Ex. 2.)  Sgt. Beattie responded that he thought it was because Gardea was drug trafficking.  (Ex. 2.)  Gardea responded that he was not.  (Ex. 2.)  No *Miranda* warnings were given prior to this conversation.  (Ex. 2.) Sgt. Beattie then explained that they were all going to another location, that Davis would be driving the F-150 to the location, and that the Escalade would be searched.  (Ex. 2.) Sgt. Beattie returned Gardea's driver's license and told Gardea that he was not under arrest but was being detained.  (Ex. 2.) Sgt. Beattie also told Gardea that he would not be placed in handcuffs for the ride over to the facility where the Escalade would be searched.  (Ex. 2.)

Sgt. Beattie then drove Gardea to the location where the Escalade was going to be searched. (Ex. 2.)  Gardea rode in the front seat and was not handcuffed.[7]  (Ex. 2.) During the ride, Sgt. Beattie did engage the defendant in small talk.  (Ex. 2.)  He asked Gardea how long they were planning the trip to Nebraska, what type of work he did and for whom, does his wife work, and whether there were problems with the fuel pump on the vehicle before.  Sgt. Beattie and Gardea also talked about the name of his kids and his wife. (Ex. 2.)   No *Miranda* warnings were given prior to this conversation.  (Ex. 2.)

While the traffic stop of the F150 was being conducted, Seward County Sheriff Michael Vance ("Sheriff Vance")[8] observed a tow truck traveling eastbound towards him on I-80.  (TR. 8.) The tow truck was hauling an Escalade, which was later determined to have Texas license plates. (TR. 8; TR. 15.)  Sheriff Vance testified that when he initially observed the tow truck, he did not see the Escalade.  (TR. 8.)  At the time he saw the tow truck, Sheriff Vance was parked in the crossover of I-80 facing south, at approximately mile-marker 366.  (TR. 9.)  Sheriff Vance testified he was monitoring traffic using stationary radar.  (TR. 9.)  Sheriff Vance testified that prior to seeing the tow truck, he received messages by telephone and over the radio from the Nebraska State Patrol and another law enforcement agency that there would be a vehicle on I-80 hauling

---

[7] Because Sgt. Beattie had his drug dog in the vehicle, Gardea had to sit in the front seat.

[8] Vance has been the Sheriff of Seward County for approximately two years and with the Seward County Sheriff's Office for fourteen years.  (TR. 7.)   Prior to becoming Sheriff, Vance was the training sergeant and sergeant over the K-9 units, and part of an interdiction team.  (TR. 7.)

thirty pounds of methamphetamine. (TR. 53-54.) Sheriff Vance did not know the underlying source of information regarding contraband in the vehicle. (TR. 63.)

As the tow truck approached, Sheriff Vance saw it move from the inside lane of I-80 to the outside lane, only signaling after the tow truck's tires crossed the line dividing the lanes. (TR. 8, 10.) Sheriff Vance testified this is a violation of the Nebraska rules of the road because drivers are required to activate their signals a minimum of 100 feet prior to changing lanes. (TR. 8; TR. 40.) Sheriff Vance testified that he measures feet by looking at the painted markings or reflector poles on the interstate because they are 100 feet apart. (TR. 42.) Sheriff Vance stated that after the tow truck went by, several cars passed him and then he was able to pull out onto I-80. (TR. 8.) At that point, Sheriff Vance activated his cruiser's camera to record in case the tow truck committed any further traffic infractions.[9] (TR. 10, 13.) Sheriff Vance testified that the initial traffic violation was not recorded because his cruiser was not facing traffic. (TR. 11.) Sheriff Vance began traveling eastbound and caught up to the tow truck. (Ex. 5; TR 10.) Sheriff Vance testified that when he was following the tow truck, he observed the tow truck signal just as it started to change lanes and drive on the shoulder of I-80. (TR. 8-10.)

Sheriff Vance initiated a traffic stop of the tow truck at the Milford rest area, which is at mile-marker 381. (TR. 9, 13.) Sheriff Vance testified that due to the size of the tow truck, he waited to initiate the traffic stop until he got to a place where the vehicles could exit I-80. (TR. 13.) Once the vehicles were stopped at the rest area, Sheriff Vance exited his cruiser, made contact with the driver, and asked for his license and registration. (Ex 6; TR. 13.) The tow truck was being driven by Mark Thomas ("Thomas"). Robles was a passenger in the tow truck. (Ex. 6; TR. 14.) Sheriff Vance noticed that Robles was texting on his phone at the time of the traffic stop. (TR. 15.)

---

[9] Sheriff Vance stated his cruiser is equipped with a camera that faces straight ahead from the windshield towards the front of the cruiser and a camera that faces the passenger seat. (TR. 11.) Sheriff Vance testified that his cruiser's cameras start recording when emergency lights are activated or when an officer starts them manually. (TR. 10.) The cameras are also able to capture thirty seconds of time prior to the time they are activated. (TR. 10.) In this case, Sheriff Vance stated he activated the cameras manually because he did not initially turn on his emergency lights. (TR. 10.)

Sheriff Vance explained why he stopped the vehicle and asked Thomas to go back to his cruiser so he could issue him a written warning.  (Ex. 6; TR. 14.)  Thomas agreed.  (TR. 14.) Sheriff Vance testified that it normally takes around fifteen minutes to issue a warning ticket.  (TR. 48.)  Once in the cruiser, Thomas told Sheriff Vance that the tow truck company, which is out of Kansas, was called the evening of January 28, 2020 to haul the Escalade to a hotel just south of Hebron, Nebraska because the water pump in the Escalade went out. (Ex. 5; TR. 15-16.)  Thomas informed Sheriff Vance that the Escalade had broken down just north of the Kansas border.  (Ex. 5; TR. 15.)  Thomas stated they were contacted again the next day by a Nebraska number by an individual in Omaha, Nebraska (Ex. 5; TR. 16.)  Thomas told Sheriff Vance that he went to the hotel and spoke to a white male, who was later identified as Kmiecik.  (Ex. 5; TR. 16.)  Kmiecik asked Thomas how much it would cost to tow the Escalade to Omaha.  (Ex. 5; TR. 16.)  Thomas told Kmiecik it would cost $75.00 to load the Escalade and $4.00 per mile to tow it to Omaha.  (Ex. 5; TR. 16.)  Sheriff Vance testified that he thought it was suspicious that the Escalade was being towed because it would have been cheaper to fix the water pump.  (TR. 18.) Sheriff Vance stated that Thomas told him Robles barley spoke to him the whole trip.  (Ex. 5, 6; TR. 17.)

As he was completing the process of issuing the written warning, Sheriff Vance returned to the tow truck to check the VIN on the tow truck.  (Ex. 6; TR. 18-19.)  At that time, Sheriff Vance noticed Robles was on his phone again.[10]  (Ex. 6; TR. 18.)  Sheriff Vance, speaking English, asked Robles if he was the owner of the Escalade.[11]  (Ex. 6; TR. 18; TR. 62.)  Robles responded he was not.  (TR. 18.)  Robles told Sheriff Vance that the owner of the Escalade, who was later identified as Davis, was in the white truck behind them that had been stopped by another cop.  (Ex. 6; TR. 18-19.)  Sheriff Vance testified that at that point, he knew Robles was communicating with the occupants of the F150.  (TR. 18.)  Sheriff Vance was aware that there were other deputies conducting a traffic stop because he heard this information on radio traffic.  (TR. 18.)

---

[10] Sheriff Vance never told Robles he could not use his phone or otherwise direct Robles how to behave. (TR. 50.)  At the beginning of the traffic stop, Sheriff Vance allowed Robles to use the bathroom.  (Exs. 5,6; TR. 50.)

[11] Sheriff Vance testified he did not have difficulties communicating with Robles in English.  (TR. 62.)

Sheriff Vance was contacted by Deputy Blath on his phone and he asked if the owner of the Escalade was in the F150.[12] (Ex. 6; TR. 18.) Sheriff Vance testified that Deputy Blath told him that Kmiecik stated he did not know the occupants of the tow truck. (TR. 37.) However, after a minute or two, Deputy Blath confirmed that the owner of the Escalade was in the F150. (Ex. 6; TR. 18.) Deputy Blath also informed Sheriff Vance that Robles' ID was in the F150. (TR. 34.) Sheriff Vance asked Robles why he was in the tow truck given he was not the owner of the Escalade. (TR. 19.) Robles responded that he was instructed to watch the Escalade. (TR. 19.) Sheriff Vance testified that he thought it was suspicious that the Escalade was not being towed with its owner. (TR. 20; TR. 3.) Sheriff Vance stated it was his understanding from Deputy Blath that Robles was never an occupant of the Escalade and that Robles had come from Omaha in the F150 with Kmiecik. (TR. 35.) Sheriff Vance testified that he thought this was suspicious because Robles and Kmiecik were not the owners of the Escalade but had driven to Hebron to wait for the tow truck. (TR. 35.) Thomas had told Sheriff Vance that Robles was present at the hotel when he picked up the Escalade to tow it to Omaha. (TR. 34-35.) Thomas said the situation felt shady when he picked everyone up. (Exs. 5, 6.)

Sheriff Vance testified that based on all the information he had gained during the traffic stop, including the information he received from Deputy Blath, he had reasonable suspicion to detain the occupants for further investigation. (TR. 20.) At that point, he asked Deputy Jason Henkel ("Deputy Henkel") with the Lancaster County Sheriff's Office, who had arrived on the scene of the traffic stop, to run his K-9 around the Escalade.[13] (TR. 20; TR. 69-70.) Before running the K-9, Sheriff Vance asked Thomas for consent to search, and Thomas told him to do whatever he needed to do. (Ex. 5; TR. 22.) Sheriff Vance testified Thomas was cooperative and consented to the K-9 sniff. (TR. 22.) Sheriff Vance testified that does not recall whether he asked Robles for consent to search. (TR. 22.)

---

[12] Sgt. Beattie testified that he was passing information he learned during the traffic stop to Deputy Blath but was not present when Deputy Blath spoke to Sheriff Vance. (TR. 91.) Sgt. Beattie testified that he does not recall exactly what information he passed to Deputy Blath. (TR. 95.)

[13] Deputy Henkel has been with the Lancaster County Sheriff's Office since 2006. (TR. 69.) He has been with the criminal interdiction unit since 2013. (TR. 69.) Deputy Henkel's K-9 has been certified since 2012. (TR. 70.)

Robles was taken to Deputy Henkel's patrol car. Deputy Henkel testified that Robles provided him consent to search when he was sitting in the back of Deputy Henkel's patrol car before the K-9 was deployed. (TR. 73.) Deputy Henkel stated it is standard practice to request consent before deploying a K-9. (TR. 82.) Deputy Henkel testified that his conversation with Robles was not recorded because Deputy Henkel forgot to manually activate his recording system. (TR. 74.)

Deputy Henkel then deployed his K-9 around the Escalade. (TR. 71.) Deputy Henkel testified that he had some issues trying to get his K-9 high enough to conduct the sniff because the Escalade was on the flatbed portion of the tow truck. (TR. 71.) Deputy Henkel stated that at one point he lifted his K-9 up, and the K-9 started to alert a little bit underneath the Escalade, but he could tell the K-9 was uncomfortable because of the height and the K-9 jumped down. (TR. 71.) Deputy Henkel then spoke to Sheriff Vance about rolling the Escalade off the flatbed so the K-9 could run around the vehicle. (Ex. 6; TR. 71.) Thomas lowered the Escalade off the flatbed and the K-9 was deployed around the Escalade itself. (Ex. 5; TR. 22; TR. 71.) Deputy Henkel testified the K-9 alerted and indicated to the presence of narcotics near the rear of the Escalade. (Ex. 5; TR. 21; TR. 72; TR. 74.)

Following the positive alert and indication, Sheriff Vance contacted Deputy Blath and told them he was having the Escalade towed to a shop for a probable cause search. (Ex. 6; TR. 21.) Sheriff Vance testified he wanted to search the Escalade at a different location due to the poor weather conditions. (TR. 22.) Sheriff Vance instructed Deputy Blath to bring the occupants of the F150 to the shop. (Ex. 6; TR. 21.) Thomas agreed to tow the Escalade to the shop for the search. (TR. 22.) The Escalade was towed to Meyer Automotive, which is located approximately two miles west of the location of the traffic stop. (TR. 22.)

When the tow truck and Escalade arrived at Meyer Automotive, Sgt. Beattie, Deputy Blath, and the occupants of the F150 were already there. (Ex. 2; TR. 23.) Sheriff Vance then went to speak to Robles outside the vehicle. (TR 23.) Sheriff Vance told Robles he was not under arrest and he was not sure whether Robles was going to be arrested, but that he was going to be read his *Miranda* rights anyway. Sheriff Vance then read Robles his *Miranda* rights. (TR. 23.) Sheriff Vance testified that Robles was not cooperative and did not want to talk, so he was placed inside a patrol car. (TR. 23.)

9

While at Meyer Automotive, Sheriff Vance also interviewed Davis. (Ex. 7; TR. 24.) Davis told him that Gardea was her husband and that she had two children with him. (Ex. 7; TR. 24.) Davis said they were going to visit Gardea's family in Kansas. (Ex. 7; TR. 24.) Sheriff Vance asked why they were in Nebraska, and Davis told him that when she noticed they were not in Kansas, she asked Gardea where they were going but he would not answer her. (TR. 24.) Sheriff Vance clarified whether Davis was married to Gardea, and Davis told him they were not actually married, but they lived together and had children together. (Ex. 7; TR. 24-25.) Later in the conversation Davis admitted she lied about going to visit family in Kansas. (TR. 25.) She stated they had made other trips to Omaha and would stay at a hotel in Gretna, Nebraska. (TR. 25.) Someone would meet them in Gretna to retrieve contraband from her Escalade, and then they would go back to Juarez, Mexico. (TR. 25.) Davis also told Sheriff Vance she knew Robles but did not know Kmiecik. (TR. 36.)

The Escalade was backed into the shop and searched by several deputies. (TR. 23-24.) The deputies located a compartment in the passenger's side rear firewall and observed packages in it. (TR. 24.) The deputies removed the outer covering and retrieved twenty-one packages out of the Escalade. (TR. 24.) The deputies tested one of the packages and it came back positive for methamphetamine. (TR. 24.) The deputies found 27.1 pounds of methamphetamine in the Escalade. (TR. 24.)

While at Meyer Automotive, Sheriff Vance also spoke to Gardea in his cruiser. (Ex. 1; Ex. 9; TR. 25.) Sheriff Vance told Gardea what happened next depended upon his honesty. (Ex. 9.) Sheriff Vance told Gardea he was not under arrest and officers were not sure what they were going to do. (Ex. 9.) Sheriff Vance informed Gardea that if he was not honest, and his story did not match what Davis told him, he was going to jail. (Ex. 9.) Sheriff Vance read Gardea his *Miranda* rights, Gardea indicated he understood his rights, and Gardea agreed to speak to him.[14] (Ex. 9; TR. 25-26.) Sheriff Vance explained that officers found methamphetamine in the Escalade. (Ex. 9.) Sheriff Vance proceeded to ask more questions and told Gardea that federal agents were coming to talk to him. (Ex. 9.) Sheriff Vance told Gardea if he was honest with them, he would

---

[14] Gardea also gave a post-arrest interview at the Sheriff's Office. (Ex. 1; TR. 17.) He is not challenging the admissibility of this statement. (Filing No. 62 at CM/ECF p. 10.)

get state charges, but if he lied, he would get federal charges.  (Ex. 9.)  Sheriff Vance also told Gardea that if he was scared of other individuals, Gardea should let the federal agents know because they could protect him.  (Ex. 9).  Sheriff Vance told Gardea not to sacrifice his or his families' safety.  (Ex. 9.)  Gardea told Sheriff Vance about the hotel in Gretna.  (Ex. 9; TR. 26.) He also stated he did not know he was hauling drugs and that he normally transports money from Omaha to Juarez, Mexico.  (Ex. 9; TR. 26.)

Sheriff Vance testified that he spoke to Gardea in English and did not have problems communicating with him.  (TR. 66.)  Sheriff Vance testified that he did not make any threatening or intimidating gestures, brandish his weapon, or make any promises to Gardea.  (TR. 65-67.) Sheriff Vance stated he did not raise his voice and spoke in a conversational tone.  (TR. 65.)  Sheriff Vance testified that Gardea appeared to be of average intelligence and was very nice and polite. (TR. 65-66.).  Sheriff Vance testified that Gardea did not appear to be under the influence of drugs or alcohol.  (TR. 66.)

## DISCUSSION

### 1.     <u>Traffic Stops</u>

It is well-established that a "police officer may stop a vehicle when he or she has probable cause to believe that the driver has committed a traffic violation." *United States v Andrews*, 454 F.3d 919, 921 (8th Cir. 2006).  "Probable cause exists when a reasonable officer, confronted with the facts known to the officer at the time of the stop, could have believed that there was a fair probability that a violation of law had occurred." *Id*.  The determination of whether probable cause existed is not to be made with the vision of hindsight, but instead by looking to what the officer reasonably knew at the time." *United States v. Sanders*, 196 F.3d 910, 913 (8th Cir. 1999) (quotation omitted).

"Any traffic violation, however minor, provides probable cause for a traffic stop." *United States v. Gadson*, 670 F. App'x 907, 908 (8th Cir. 2016) (quotation omitted). This is true "even if the police would have ignored the traffic violation but for their suspicion that greater crimes are afoot." *United States v. Long*, 532 F.3d 791, 795 (8th Cir. 2008) (internal quotation omitted).

"Courts are not to consider the motive for a stop as long as the reason for the stop is valid." *United States v. Jones*, 275 F.3d 673, 680 (8th Cir. 2001).

A.  **Stop of the F150**

Gardea argues the traffic stop was unlawful because there was no probable cause to believe Kmiecik committed a traffic violation.  The undersigned finds this argument unpersuasive.  Sgt. Beattie testified he observed the F150 following less than two seconds behind a Walmart semi-tractor trailer.  The relevant Nebraska statute governing distance between vehicles provides that the "driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, and such driver shall have due regard for the speed of such vehicles and the traffic upon and the condition of the roadway."  Neb. Rev. Stat. §60-6,140(1).  The Eighth Circuit has recognized that "[t]he two-second rule . . . is a 'widely used rule of thumb that accounts for the speed of traffic' and is an appropriate measurement of whether a trailing car is maintaining a reasonable and prudent distance." *United States v. Lopez*, 564 F.3d 1001, 1003 (8th Cir. 2009) (quoting *United States v. Andrews*, 454 F.3d 919, 921-22 (8th Cir. 2009)).

Although the traffic violation was not captured on camera, the record shows that Sgt. Beattie had an objectively reasonable basis for believing Kmiecik committed a traffic violation.[15] Sgt. Beattie is an experienced officer with numerous years of experience.  Sgt. Beattie credibility testified there was approximately one second between the vehicles.  Sgt. Beattie testified that two seconds is considered a safe following distance.   Based on his observations, Sgt. Beattie contacted Deputy Blath who then initiated the traffic stop. Because Sgt. Beattie reasonably believed he observed a traffic violation, there was probable cause for the traffic stop.  *See United States v. Horne*, 4 F.3d 579, 585 (8th Cir. 1993) ("[P]robable cause may be based on the collective knowledge of all law enforcement officers involved in an investigation and need not be based solely upon the information within the knowledge of the officer on the scene if there is some degree of communication").

---

[15] While at Meyer Automotive, Deputy Blath spoke to Kmiecik again.  (Ex. 4.) At that point, Kmiecik acknowledged on video that the following too closely violation occurred when the semi merged over.  (Ex. 4.)

### B.     Stop of the Tow Truck

Robles argues the traffic stop of the tow truck was not supported by probable cause because Sheriff Vance did not have a reasonable belief that there had been a traffic violation.  This argument is not supported by the record.  Sheriff Vance testified that as the tow truck initially approached him on I-80, he observed it move from the inside lane of I-80 to the outside lane, only signaling after the tow truck's tires crossed the line dividing the lanes.  Sheriff Vance testified this is a violation of the Nebraska rules of the road because drivers are required to activate their signals a minimum of 100 feet prior to changing lanes.  Sheriff Vance stated that the initial traffic violation was not recorded because his cruiser was not facing traffic.  Sheriff Vance stated that after the tow truck went by, he pulled onto I-80 and activated his cruiser's camera to record in case the tow truck committed any further traffic infractions.  While following the tow truck, Sheriff Vance observed the tow truck signal just as it started to change lanes and drive on the shoulder of I-80.

The relevant Nebraska statute governing changing lanes states that a "signal of intention to turn or move right or left when required shall be given continuously during not less than the last one hundred feet traveled by the vehicle before turning."  Neb. Rev. Stat. § 60-6,161(2).  Also, Nebraska generally provides that no person shall drive on the shoulders of highways.  Neb. Rev. Stat. § 60-6,142.  Violations of these statutes are captured on the video recordings marked as exhibits in this matter and, at the very least, support Sheriff's Vance's objective belief that traffic violations occurred.  The undersigned concludes Sheriff Vance had probable cause to stop the tow truck.

### 2.     Duration of the Traffic Stops

"An officer may detain the occupants of a vehicle while completing routine tasks related to the traffic violation, such as asking for license and registration or inquiring about the occupants' destination, route, and purpose." *United States v. Chartier*, 772 F.3d 539, 543 (8th Cir. 2014).  Once the purpose of an initial traffic stop is complete, an officer cannot further detain the vehicle or its occupants unless something occurs during the traffic stop that generates the necessary reasonable suspicion to justify a further detention. *See United States v. Beck*, 140 F.3d 1129 (8th Cir. 1998).  Absent reasonable suspicion, an officer may not broaden the investigation "beyond

the time reasonably required to complete the mission of issuing a warning ticket." *Rodriguez v. United States*, 135 S.Ct. 1609, 1615 (2015) (quotation omitted).

Reasonable suspicion exists if an officer is aware of "particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed." *Beck*, 140 F.3d at 1136 (quotation omitted). "Whether the particular facts known to the officer amount to an objective and particularized basis for a reasonable suspicion of criminal activity is determined in light of the totality of the circumstances." *United States v. Garcia*, 23 F.3d 1331, 1334 (8th Cir. 1994). "Whether such suspicions are reasonable is assessed from the point of view of trained law enforcement officers based on the totality of the circumstances known to the officers at the relevant time." *United States v. Zamora-Lopez*, 685 F.3d 787, 790 (8th Cir. 2012).

Based on the totality of the circumstances, the undersigned finds the traffic stops were not unlawfully prolonged. Within approximately four minutes of the traffic stop, Kmiecik was in Deputy Blath's cruiser and the process of conducting a records check had begun. The records check took some time because Deputy Blath had difficulty spelling Kmiecik's name and Kmiecik did not produce identification until approximately fourteen minutes into the stop. The records check raised the question of whether Kmiecik had a warrant out for a protection order violation. Thus, Deputy Blath had to take the time to verify whether there was a warrant. Moreover, because the F150 was not registered to Kmiecik, Deputy Blath also had to verify the vehicle's registration. When the records check revealed that Kmiecik's license was suspended, the officers had to determine whether one of the other occupants could drive the F150 from the scene. Sgt. Beattie testified that the traffic stop was delayed because they were trying to find a licensed driver from the F150. Given the number of tasks that needed to be completed under the circumstances presented, the record does not support that the traffic stop was unlawfully prolonged.

Moreover, during the process of issuing the warning ticket to Kmiecik, which included finding a licensed driver, reasonable suspicion developed for extending the traffic stops. The officers discovered the tow truck and F150 were traveling together. However, the parties gave conflicting statements regarding their relationship. *See United States v. Barragan*, 379 F.3d 524, 529 (8th Cir. 2004) ("[C]onflicting stories may provide justification to expand the scope of the

14

stop and detain the occupants").  Further, the circumstances surrounding their travel was suspect. Thomas told Sheriff Vance that his tow truck company, which is out of Kansas, was called to haul the Escalade to a hotel just south of Hebron. Thomas stated he was contacted again the next day by a Nebraska number by an individual in Omaha to tow the Escalade to Omaha.  Thomas reported it cost $75.00 to load the Escalade and $4.00 per mile to tow it to Omaha. Sheriff Vance testified that he thought it was suspicious that the Escalade was being towed because it would have been cheaper to fix it. The officers also thought it was suspicious that Robles was in the tow truck when he was not the owner of the Escalade.  Sheriff Vance stated it was his understanding that Robles was never an occupant of the Escalade and that Robles had come from Omaha in the F150.  Sheriff Vance testified that he thought this was odd because Robles was not the owner of the Escalade but had driven to Hebron to wait for the tow truck.  Based on the information known to officers by the time the K-9 was run around the tow truck and Escalade, there was reasonable suspicion for the continued detention.

### 3.   **Statements**

Gardea argues the roadside questioning during the traffic stop violated his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966).  The Fifth Amendment requires that *Miranda* warnings be given when a person is interrogated by law enforcement after being taken into custody or otherwise deprived of freedom of action in any significant way.  *United States v. Huether*, 673 F.3d 789, 794 (8th Cir. 2012).  In determining whether a suspect is "in custody" at a particular time, courts "examine the extent of the physical or psychological restraints placed on the suspect during interrogation in light of whether a reasonable person in the suspect's position would have understood his situation to be one of custody."  *United States v. Griffin*, 922 F.2d 1343, 1347 (8th Cir.1990) (quotation omitted). Indicia of custody include:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.

15

*Id.* (quotation omitted). Most routine traffic stops do not trigger the need for *Miranda* warnings, and an individual temporarily detained pursuant to an investigatory traffic stop is not in custody for purposes of *Miranda*. *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984).

Gardea claims he was immediately in custody for purposes of *Miranda* because Sgt. Beattie instructed him to stay in the patrol car when he initially went to speak to Kmiecik. The undersigned finds this argument unpersuasive. The Eighth Circuit Court of Appeals has found that a consensual encounter is not transformed into a seizure simply because an officer instructs an individual to stay in place. *See United States v. McManus,* 70 F.3d 990, 992–93 (8th Cir. 1995) (finding that an officer's direction to come back and have a seat did not transform an encounter into a seizure); *United States v. Angell,* 11 F.3d 806, 809–10 (8th Cir. 1993) (stating that officer's statement to "stay there" or "hold it right there" did not transform consensual encounter into seizure), *abrogated on other grounds as recognized by United States v. McKinney*, 120 F.3d 132, 133 (8th Cir. 1997).

Also, the fact that Gardea was questioned in the patrol car is of no consequence. "An officer making a traffic stop does not violate the Fourth Amendment by asking the driver his destination and purpose, checking the license and registration, or requesting the driver to step over to the patrol car." *United States v. Linkous,* 285 F.3d 716, 719 (8th Cir. 2002). "A police officer may undertake similar questioning of the vehicle's occupants to verify the information provided by the driver." *Id.* Sgt. Beattie asked Gardea to accompany him to his patrol car to determine whether Gardea could drive the F150 from the scene. While in the patrol car, Sgt. Beattie ran a records check on Gardea and asked Gardea routine questions about his travel itinerary. At some point during this process, Sgt. Beattie exited the patrol car to compare the information provided by Gardea to that given by Kmiecik. Sgt. Beattie's actions in this regard did not render Gardea in custody for purposes of *Miranda*. "*Miranda* warnings are not imposed because the questioning is conducted in a certain place, i.e., a patrol car, or because the person being questioned is suspected of having committed some offense." *United States v. Boucher*, 909 F.2d 1170, 1174 (8th Cir. 1990).

Gardea also argues he was in custody for purposes of *Miranda* once officers first determined they had sufficient information to detain him. The undersigned disagrees that Gardea

16

was in custody at that point.  After Sgt. Beattie found the stories provided by Gardea and Kmiecik did not match, he returned to his patrol car to ask Gardea further questions and received a call on his cell phone.  Gardea was sitting in the vehicle and could hear Sgt. Beatie's conversation.  Sgt. Beatie told the person on the phone that he had enough to detain the occupants to further the investigation.  Sgt. Beattie got off the phone and told Gardea that his story did not match the information provided by Kmiecik.  Sgt. Beattie also told Gardea that a dog had alerted on the Escalade.  Beattie asked Gardea whether there were drugs in the vehicle or if he was transporting anything illegal.  Gardea said there were no drugs and that he had nothing to tell Sgt. Beattie.  Sgt. Beattie then informed Gardea that they were going to take everyone until they searched the Escalade.  Sgt. Beattie told Gardea to stay in the patrol car and then he exited the patrol car to speak to Davis.

Considering the totality of the circumstances, the undersigned finds that before Sgt. Beattie told Gardea that they were going to take everyone until they searched the Escalade and left the patrol car to speak to Davis, a reasonable person in Gardea's position would not have understood his situation to be one of custody.  At the time Sgt. Beattie told the individual on the phone that they had enough information to detain, the purpose of the traffic stop had not been completed. There is no indication that Sgt. Beattie made the statements regarding detention on the phone in front of Gardea as part of a deceptive strategy or scheme to get Gardea to make incriminating statements. There was reasonable suspicion to detain the occupants but Gardea was never told he was going to be detained at this point.  *See* *Griffen,* 922 F.2d at 1351.  It is clear from the record that the officers were still trying to determine the relationship between the parties and investigate the situation.

Further, the officers were not displaying behavior or subjecting Gardea or the other occupants to treatment which would reasonably cause them to believe they were in custody.  The officers did not exhibit any coercive or threatening tones or actions, nor did they limit the occupants' freedom of movement. None of the occupants were handcuffed and Kmiecik was allowed to exit the patrol car and smoke cigarettes, which Gardea could see him doing. Gardea appeared to understand the questions and cooperate with officers.  Therefore, because a reasonable person in Gardea's position would not have understood his situation to be one of custody, *Miranda* warnings were not required at the time of this questioning.

Things changed, however, once Sgt. Beattie told Gardea he was going to be taken to the location where the Escalade was to be searched and exited the vehicle to speak to Davis. At that point, a reasonable person would have understood his situation to be one of custody. When Sgt. Beattie returned to his patrol car after speaking to Davis, he began asking questions of Gardea that would likely elicit incriminating responses. Sgt. Beattie did not tell Gardea he did not have to answer the questions. Sgt. Beattie had already told Gardea he was being detained so he was not free to leave. Under the totality of the circumstances, a reasonable person would not have believed he was at liberty to stop the questioning and leave.

The undersigned recognizes that during the roadside questioning, the officers were trying to investigate and sort out the situation, which was very confusing. The undersigned believes the officers were being forthright with the parties and were not attempting to be deceptive or manipulate anyone. Nevertheless, once Sgt. Beattie told Gardea he was going to be detained until the Escalade was searched, Gardea would have understood he was not free to leave. Accordingly, the undersigned finds that any statements Gardea made after Sgt. Beattie left the patrol car to speak to Davis, up to the time he was provided his *Miranda* warnings by Sheriff Vance, should be suppressed.

Gardea argues the statements he gave to Sheriff Vance at the mechanic shop should also be suppressed. Gardea contends that although he was provided his *Miranda* advisement prior to giving these statements, they should nonetheless be suppressed because he was interrogated at the site of the traffic stop without being read his *Miranda* rights. The Eighth Circuit Court of Appeals has held that "when a defendant moves to suppress a post-warning statement that he contends was given as part of a question-first interrogation, the prosecution must prove, by a preponderance of the evidence, that the officer's failure to provide warnings at the outset of questioning was not part of a deliberate attempt to circumvent *Miranda*." *United States v. Ollie*, 442 F.3d 1135, 1142-43 (8th Cir. 2006).

Here, it is apparent that the officers were not trying to circumvent *Miranda* through the roadside questioning. Gardea was initially not in custody while questioned by Sgt. Beattie at the scene of the traffic stop. However, once Gardea was told he would not be released until the Escalade was searched, *Miranda* warnings should have been provided. Still, during the entirety

18

of the roadside questioning, officers were investigating the situation and trying to determine the relationship between the parties. Sgt. Beattie was not acting in bad faith and was upfront with Gardea about what was happening and what was going to happen. There were no admissions at the scene of the traffic stop that were used to illicit a later admission. Gardea did not make any incriminating statements during roadside questioning, let alone any admissions. Moreover, Sheriff Vance, who was not on the scene of Gardea's traffic stop, questioned Gardea at Meyer Automotive following the discovery of methamphetamine. In short, there is no indication that there was a deliberate attempt to circumvent *Miranda* which would justify suppressing Gardea's post-*Mirandized* statements.

Gardea further argues the statements he gave to Sheriff Vance at the mechanic shop should be suppressed because he did not knowingly and voluntarily waive his *Miranda* rights. While not entirely clear, it also appears Gardea contends that even if he validly waived *Miranda*, his statements should be suppressed because they were given involuntarily. The undersigned finds no merit to either argument.

"A defendant's waiver of his *Miranda* rights must be made voluntarily, knowingly, and intelligently." *United States v. Duran*, 109 F. Supp.3d 1093, 1102 (D. Minn. 2015). In evaluating whether a waiver was made voluntarily, knowingly, and intelligently, courts examine (1) whether the waiver was the product of a free and deliberate choice rather than intimidation, coercion, or deception and (2) whether the suspect waived his rights with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. *Id*. "The Government has the burden of proving the validity of the *Miranda* waiver by a preponderance of the evidence." *United States v. Haggard*, 368 F.3d 1020, 1024 (8th Cir. 2004). A finding of police coercion is "a necessary prerequisite to a determination that a waiver was involuntary." *United States v. Turner*, 157 F.3d 552, 555 (8th Cir. 1998).

Similarly, "[i]n considering whether a confession was voluntary, the determinative question is whether the confession was extracted by threats, violence, or promises (express or implied), such that the defendant's will was overborne and his or her capacity for self-determination was critically impaired." *United States v. Kilgore*, 58 F.3d 350, 353 (8th Cir.1995). In assessing voluntariness, courts look at the totality of the circumstances, including not only the conduct of the police, but also the defendant's ability to resist police pressure. *United States v.*

*Pierce,* 152 F.3d 808, 812 (8th Cir.1998). In evaluating the totality of the circumstances, courts also consider the defendant's maturity level, education, physical condition, and mental condition. *United States v. Sanchez,* 614 F.3d 876, 883 (8th Cir. 2010).

The evidence shows Gardea knowingly and voluntarily waived his *Miranda* rights and that his statements to Sheriff Vance were made voluntarily. Before being questioned by Sheriff Vance, Gardea was provided *Miranda* warnings. Gardea acknowledged that he understood his rights and answered Sheriff Vance's questions. Sheriff Vance spoke to Gardea in English and did not have problems communicating with him. Sheriff Vance did not make any threatening or intimidating gestures or brandish his weapon. Throughout the conversation, Sheriff Vance did not raise his voice and spoke in a conversational tone. Sheriff Vance testified that Gardea appeared to be of average intelligence and was very nice and polite. Gardea did not appear to be under the influence of drugs or alcohol. Although Sheriff Vance told Gardea if he was honest, he would get state charges but if he lied, he would get federal charges, Sheriff Vance's statement did not amount to a promise made to entice Gardea to cooperate. *See* *United States v. Roberts,* 975 F.3d 709 (8th Cir. 2020) (finding that confronting a defendant with the possibility of federal charges and loss of his children was not a tactic that amounted to improper threats or promises that overbore the defendant's will). In the context of the conversation in its entirety, it is apparent Sheriff Vance was merely explaining the situation to Gardea so he could make informed decisions. Based on the record, the undersigned finds Gardea was properly advised of his *Miranda* rights, he knowingly, intelligently, and voluntarily waived these rights, and his responses to Sheriff Vance's questions were voluntary.

### 4.    **Standing**

"Fourth Amendment rights are personal rights that may not be asserted vicariously." *Barragan,* 379 F.3d at 529. "An individual asserting Fourth Amendment rights must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable." *Id.* (quotation omitted). "If a defendant fails to prove a sufficiently close connection to the relevant places or objects searched he has no standing to claim that they were searched or seized illegally." *United States v. Gomez,* 16 F.3d 254, 256 (8th Cir.1994). "[A] mere passenger does not have standing to challenge a vehicle search where he has neither a property nor a

possessory interest in the automobile." *United States v. Anguiano*, 795 F.3d 873, 878 (8th Cir. 2015) (internal quotation omitted).

Robles contends there was not probable cause for search of the tow truck and Escalade. Robles does not, however, have standing to raise this argument.[16]  At the time of the traffic stop, Robles was a passenger in the tow truck.  Robles was never observed in the Escalade.  Neither the tow truck nor the Escalade belonged to Robles.  Robles did not have any possessory interest in either vehicle.  Moreover, Robles consented to the K-9 sniff of the Escalade.  The undersigned finds Robles does not have standing to challenge the search.

Accordingly,

**IT IS RECOMMENDED** to United States District Court Judge Robert Rossiter, Jr. that Defendant Pedro Adolfo Robles' (Filing No. 35) motion to suppress be denied in its entirety, and that Christian Gonzales-Gardea's (Filing No. 38) motion to suppress be granted, in part, and denied in part.

Dated this 16th day of November, 2020.

BY THE COURT:

s/ Susan M. Bazis
United States Magistrate Judge

## ADMONITION

Pursuant to NECrimR 59.2, any objection to this Findings and Recommendation shall be filed within fourteen (14) days after being served with a copy of this Findings and Recommendation. Failure to timely object may constitute a waiver of any such objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.

---

[16] Gardea admits he does not have standing to challenge the stop, search, and seizure of the Escalade.